HOFER, Appellant v. GENERAL DISCOUNT CORP., et al., Respondents

(192 N.W. 2d 718)

(File No. 10812. Opinion filed December 9, 1971)

134

**Brady, Kabeiseman, Light & Reade, John R. Kabeiseman,** Yankton, for plaintiff and appellant.

**Bangs, McCullen, Butler, Foye & Simmons** and **Geo. A. Bangs,** Rapid City, for General Discount Corp. and William M. Smith, defendants and respondents.

**Woods, Fuller, Shultz & Smith, Francis M. Smith,** Sioux Falls, for Andrew Aman, defendant and respondent.

WOLLMAN, Judge.

This is an appeal from a judgment dismissing plaintiff's complaint against General Discount Corporation (General Discount), William M. Smith (Smith) and Andrew Aman (Aman) in a suit to recover money paid by plaintiff to purchase certain debentures from General Discount.

In 1953 plaintiff received a call from Smith and Aman at her farm home. Plaintiff had known Aman for many years. The purpose of Smith's visit was to ask plaintiff whether she had any money to invest. It appears that plaintiff had several conversations with Smith after that date. Smith sold to plaintiff for cash guaranteed debentures of General Discount in the face amount of $5,000 on November 1, 1958, and in the face amount of $7,000 on

June 20, 1959. These debentures were payable on a date certain and called for the payment of interest at the rate of 7% per annum.

On or about November 7, 1965, Smith and Aman drove to plaintiff's home. Smith had a conversation with plaintiff in her home while Aman remained in the car. Plaintiff did not know that Aman was present until the conversation with Smith had been completed. During the conversation Smith told plaintiff that "he'll have to close because on account of the Commonwealth deal." Smith explained to plaintiff that he would pay plaintiff her money within a few months, starting with giving her $1,000 and then continuing this way until he had paid her off and that in perhaps two years he would have paid it all and that he might open up again.

After this conversation was over, plaintiff and Smith went out to where Aman was sitting in Smith's car talking to a Mr. and Mrs. Joe D. Hofer. There was then a conversation among Mr. and Mrs. Hofer, plaintiff and Smith, during which Smith told plaintiff and Hofers to turn in their debentures for different ones.

The following day Mr. and Mrs. Hofer and plaintiff drove to Yankton to see Smith at his office at the Consolidated Lease Building. Smith told Mr. and Mrs. Hofer and plaintiff that they should turn in their debentures. He explained to them how he intended to repay the Hofers and plaintiff the money which they had invested in General Discount. He told them that the principal would be repaid first and then interest would be paid on the amount represented by the debentures. Plaintiff gave her $12,000 debenture[1]

---

1. At the time of trial, counsel for General Discount was unable to produce the original guaranteed debenture which had been issued to plaintiff. However, counsel for the parties stipulated that a specimen copy of the original debenture could be received into evidence. This debenture reads as follows:

"Guaranteed Debenture
GENERAL DISCOUNT CORPORATION
Yankton, South Dakota

For value received, hereby promises to pay to the order of ........................................... ....................................................... .................... .. Dollars .... ................... years from the date hereof at the office of the Corporation in Yankton, South Dakota. Interest will be paid at the rate of 5% per annum, payable semi-annually on the 30th day of April and on the 30th day of October of each year until paid or redeemed with a premium of an additional ........% per annum payable on maturity. Interest is payable at the office of the Corporation.

This note is redeemable at the option of the Corporation on any interest payment date, together with accrued interest.

IN WITNESS WHEREOF, General Discount Corporation has caused this instrument to be executed in its behalf and its corporate seal to be hereunto affixed this ....................
day of ........................................ 19 .........., the effective date hereof.

GENERAL DISCOUNT CORPORATION"

to Smith and received in exchange therefor from him Redemption Certificate #71.[2] She also received from Smith at the same time a Certificate of Accrued Interest.[3]

At all times material herein, Smith was President and General Manager of General Discount. At the time of trial he had been so employed for a period of ten to twelve years. He testified that he personally handled approximately 125 transactions in which guaranteed debentures were exchanged for redemption certificates and accrued interest certificates. Although these transactions occurred between October 23, 1965 and December 15, 1965, all of the redemption certificates and certificates of accrued interest were apparently dated November 8, 1965.

Smith started soliciting the exchange of guaranteed debentures for redemption certificates and certificates of accrued interest in the Freeman and Bridgewater, South Dakota area on or about October 23, 1965, in accordance with instructions given to him by the stockholders of General Discount at a meeting held on October 20, 1965. Defendant Aman, who was present at the

---

2. The Redemption Certificate reads as follows:
"REDEMPTION CERTIFICATE
GENERAL DISCOUNT CORPORATION
Yankton, South Dakota
FOR VALUE RECEIVED, HEREBY PROMISES TO PAY TO ...........................................
............................................................................ DOLLARS
This redemption certificate is and shall be a charge on the general funds of GENERAL DISCOUNT CORPORATION. Payments in redemption of this certificate shall be made from time to time at the discretion of General Discount Corporation as payment funds become available and paid directly to the registered owner as shown on the books of the Corporation. This certificate is transferable only on the books of the Corporation by the holder hereof in person or by attorney upon surrender of this certificate properly endorsed.
IN WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized officer and its Corporate Seal to be hereunto affixed this ........................ day of ...................................... A.D. 19 ............

...............................................................
President"

3.
"CERTIFICATE OF ACCRUED INTEREST
GENERAL DISCOUNT CORPORATION
Yankton, South Dakota
GENERAL DISCOUNT CORPORATION CERTIFIES THAT .. ............ .. ............ ......................
................................................. has earned the sum of ...... ........ ................................ .. accrued interest. The above amount, together with such sums as may be determined accrued by the Corporation on unredeemed invested funds will be paid from earnings of the Corporation at such time as all investments have been redeemed in full.
IN WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized officer and its Corporate Seal to be hereunto affixed this ...............
............ day of ...................... .... ................... A.D. 19 ... ..... ....

... ...............................................
President"

stockholders' meeting in his capacity as a stockholder, accompanied Smith on a number of the visits Smith made in the Freeman-Bridgewater area.

Although the guaranteed debentures had definite due dates, Smith testified that it was the practice of General Discount not to necessarily adhere to the due dates on the debentures if the debenture holders came in and desired to cash in their debentures. For example, five-year certificates were being redeemed at the end of nine, eleven or twelve months. It does not appear from the record that General Discount ever refused to redeem a guaranteed debenture for cash prior to October 20, 1965. In fact, it was because General Discount had honored all requests for cash redemption that the stockholders met on October 20, 1965 in order to adopt a plan which would prevent further depletion of the company's cash reserves.

Smith did not have a license for selling securities from the South Dakota Securities Commission. The guaranteed debentures, redemption certificates and certificates of accrued interest were never registered with the South Dakota Securities Commission. At no time was any agent of General Discount licensed by the South Dakota State Securities Commission to sell the guaranteed debentures, redemption certificates and certificates of accrued interest. Smith did not receive any compensation, commission or remuneration of any kind whatsoever in connection with the exchange of the guaranteed debentures for the redemption certificates. All told, guaranteed debentures totaling approximately $956,000 were exchanged for redemption certificates, including those held by the stockholders of General Discount.

Plaintiff received no payment of any kind on her redemption certificate and certificate of accrued interest. On or about August 3, 1967 plaintiff caused to be served upon the defendants a notice of election which stated that plaintiff first learned on or about April 1, 1967, that the guaranteed debentures and redemption certificate had been sold and issued in violation of the securities law of the State of South Dakota. The notice of election declared the exchange which occurred on November 8, 1965 to be a void

sale. Plaintiff demanded payment in the amount of $12,420, together with accrued interest at 7% per annum from and after November 8, 1965, and tendered the certificate of accrued interest and the redemption certificate which she had received in exchange for the guaranteed debentures.

Although no answer was filed by General Discount, an oral offer to deliver guaranteed debentures in the face amount of $12,000 to plaintiff was made by General Discount at the outset of the trial, which was held in June of 1969. This offer was joined in by Smith. Aman made no offer of any kind but alleged in his separate answer that he understood that General Discount had offered to return the debentures to plaintiff. It does not appear that Smith and Aman delivered a written offer to plaintiff to repurchase the redemption certificate within 30 days after receipt of plaintiff's notice of election.

The trial court concluded that the exchange by plaintiff of her guaranteed debentures for the redemption certificate and certificate of accrued interest constituted a sale within the meaning of the South Dakota Securities Act. The court also concluded that because the debentures and the redemption certificate were not registered under the South Dakota Securities Act the transaction was voidable at the instance of the plaintiff. The court found that plaintiff had given proper notice of election and had properly deposited the redemption certificate and certificate of accrued interest with the clerk of courts of Yankton, South Dakota, in accordance with law.

The trial court concluded that plaintiff was not entitled to recover the amount which she had originally paid for the guaranteed debentures but was only entitled to recover the consideration with which she had parted on November 20, 1965, i. e., the guaranteed debentures in the face amount of $12,000 bearing interest at 7% per annum.

▮▮ The first question is whether the guaranteed debentures and certificate of redemption were securities which were required to be registered under South Dakota law. SDCL 47-31-1(4) provides as follows:

" 'Security' shall mean and include any stock, share, bond, note, debenture, commercial paper, evidence of indebtedness, investment contract, interest in, or under a profitsharing or participating agreement or scheme, any interest in or under any oil, gas, or mining property, or in any property represented to contain or be a prospect for oil, gas, or minerals, voting trust agreement, beneficial interest in a trust or pretended trust, to include any certificates issued pursuant to said trust, or any interest in the capital, assets, property, or profits of any person. Any interest in a security shall be deemed a security".

SDCL 47-31-9 provides, subject to certain exemptions, that no securities shall be offered for sale unless and until they have been registered with the commissioner of securities.

SDCL 47-31-1(3) defines sale as follows:

" 'Sale' or 'sell' shall mean every sale or other disposition of a security or interest in a security for value, and every contract to make any such sale or disposition.   *   *   * "

We start with the proposition that statutes governing the registration and sale of securities are remedial in nature and are designed to protect the unwary buyer and thus should be liberally construed to effect the purpose for which the statutes were adopted.  See Securities & Exchange Comm. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88; Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564; Meihsner v. Runyon, 23 Ill.App.2d 446, 163 N.E.2d 236.

It is clear that SDCL 47-31 is broad and all encompassing and requires all securities to be registered before sale unless the security or the transaction comes within one of the specific exemptions contained in the law.  We hold that both the guaranteed debentures and the certificate of redemption are securities within the meaning of SDCL 47-31-1(4).

■  Defendants argue that the exchange was an exempt transaction within the meaning of SDCL 47-31-85:

"The provisions of this chapter, except as herein express-
ly provided, shall not apply to the distribution by a
corporation of capital stock, bonds, or other securities to
its stockholders or other security holders or their respec-
tive assigns as a stock dividend or other distribution out
of earnings or surplus; or an increase of capital stock of
a corporation sold only to its stockholders and without
payment of any commission or expense to any broker
or agents in connection with such distribution."

Defendants contend that because the redemption certificate
bears no due date and no interest rate it does not constitute
corporate debt in the ordinary sense of the word but rather rep-
resents an increase of capital stock of General Discount. Because
this "capital stock" was sold only to General Discount's security
holders on an exchange basis without payment of any commis-
sion or expense to any broker or agent, goes the argument, the
transaction falls within the exemption of SDCL 47-31-85. This
argument disregards the fact that SDCL 47-31-85 exempts only
those sales of increase of capital stock to the stockholders of a
corporation. Plaintiff was not a stockholder of General Discount.

We hold that the exchange of the guaranteed debentures for
the redemption certificate and the certificate of accrued interest
on November 8, 1965, constituted a sale within the meaning of
SDCL 47-31-1(3). United States v. Riedel, 7 Cir., 126 F.2d 81;
United States v. Wernes, 7 Cir., 157 F.2d 797; Kinsey v. Knapp,
D.C., 154 F.Supp. 263. We hold that the exchange transaction
which occurred on November 8, 1965 was not exempt under the
provisions of SDCL 47-31-85. Defendants apparently do not
contend that the transaction falls within any other exemption
conatined in SDCL 47-31.

We turn now to the question of the relief to which plaintiff
is entitled. SDCL 47-31-132 provides that "Every sale of a
security made in violation of the provisions of this chapter shall
be voidable at the election of the purchaser exercised as provid-
ed in § 47-31-134."

SDCL 47-31-133 provides:

"Upon tender to the seller or into court of the securities sold or, where the securities were not received of any contract made in respect of such sale, the issuer, controlling person, underwriter, broker or other person by or on behalf of whom any sale was made in violation of the provisions of this chapter, and each underwriter, broker or agent who shall have participated or aided in any way in making such sale, and in case such issuer, controlling person, underwriter or broker is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making such sale, shall be jointly and severally liable to such purchaser for

(1) the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the legal rate of interest) less any income or other amounts received by such purchaser on such securities and

(2) the reasonable fees of such purchaser's attorney incurred in any action brought for the recovery of the amounts recoverable under subdivision (1) of this section."

The notice of election provided for in SDCL 47-31-132 must be given by the purchaser within six months after he shall have knowledge that the sale of the securities to him is voidable, such notice to be given to each person from whom recovery will be sought. SDCL 47-31-134.

SDCL 47-31-135 provides:

"No purchaser shall have any right or remedy under §§ 47-31-132 to 47-31-134, inclusive, who shall fail, within thirty days from the date of receipt thereof, to ·

accept an offer to repurchase the securities purchased by him for a price equal to the full amount paid therefor plus interest thereon and less any income thereon as set forth in § 47-31-132."

SDCL 47-31-136 provides:

"Every offer of repurchase provided for in § 47-31-135 shall be in writing, shall be delivered to the purchaser or sent by registered mail addressed to the purchaser at his last-known address, and shall offer to repurchase the securities sold for a price equal to the full amount paid therefor plus interest thereon and less any income thereon as set forth in § 47-31-132. Such offer shall continue in force for thirty days from the date on which it was received by the purchaser, shall advise the purchaser of his rights and the period of time limited for acceptance thereof, and shall contain such further information, if any, as the commissioner of securities may prescribe. Any agreement not to accept or refusing or waiving any such offer made during or prior to said thirty days shall be void."

These provisions of South Dakota's Blue Sky law are in many respects similar to the provisions found in corresponding statutes in other states.[4] Nearly all states have statutes similar to SDCL 47-31-133 providing that the seller of an unregistered security is liable to the purchaser for "the full amount paid" (as in SDCL 47-31-133) or for the "consideration paid," for the security, together with interest from the date of payment for the security.[5]

Likewise, nearly all of the statutes provide that no purchaser of an unregistered security shall have any right to bring suit to recover the amount paid if he fails to accept an offer to repurchase the securities made by the seller. However, SDCL 47-31-135 and 47-31-136 provide that the offer to repurchase shall

---

4. For the background of South Dakota's Blue Sky law see State v. Martin, S.D., 187 N.W.2d 576.

5. See Loss, Securities Regulation, Vol. 3, 2d Ed., Ch. 11B.

be "for a price equal to the full amount paid therefor". Only Illinois has a similarly worded statute. See Smith-Hurd Illinois Annotated Statutes, Ch. 121½, § 137.13.[6] The statutes of other states refer to an offer by the seller to "refund the consideration paid," or to "refund the full amount paid."[7]

Defendants contend that the case of Edward v. Ioor, 205 Mich. 617, 172 N.W. 620, governs the disposition of this appeal. The plaintiff in the Ioor case purchased some common stock in the Illinois Piano Company for $6,750 in cash. The directors of Illinois Piano Company later organized the Arizona Piano Company to take over the stock of Illinois Piano Company. Plaintiff was persuaded to exchange his stock in the Illinois Piano Company for stock in the Arizona Piano Company. He later brought an action to rescind this contract of exchange and demanded the amount of money invested in the original stock. The Michigan Supreme Court held that plaintiff was entitled to what he had paid on the void contract and therefore was entitled to the return of the stocks.

The Ioor case differs from the instant case in material respects. It appears that the Michigan securities law did not provide for any civil remedies in the event of a sale of an unregistered security. Plaintiff's action was thus a common law action for rescission rather than a statutory action to enforce the civil remedies provision of a securities law. Moreover, the case involved common stock, which is equity in a corporation, rather than a mere debt security.

█ We believe that the word "price" as used by the legislature in SDCL 47-31-135 and 47-31-136 and as it relates to the words "the full amount paid" as used in SDCL 47-31-133(1) means the monetary value of that which is given in payment for an unregistered security.

---

6. SDCL 47-31-135 and 47-31-136 were copied from the Illinois statute. Loss, supra, Vol. VI, Supplement to 2d Ed., p.3789.

7. Wisconsin's Uniform Securities Law § 551.59(6) (a) provides that a purchaser may not bring an action against the seller of an unregistered security if the purchaser has received a written offer from the seller to repurchase the security "for cash payable on delivery of the security equal to the consideration paid, together with interest * * *". See also Cal. Corp.Code § 25507 (West's 1955).

"The word 'price' has a narrower meaning and is more restricted in scope than the word 'consideration,' and 'price' has been defined as the amount of money given or received in exchange for anything. (Citations)

"A consideration of these sections can lead us only to the conclusion that when the legislature makes reference to the payment of money it uses the word 'price.' When it is concerned with a broader definition it found adequate words to express its intention." Bowman v. Armour & Co., 17 Ill.2d 43, 160 N.E.2d 753, 758.

See also Theberge v. Canadian Pacific Railway Company, 119 Vt. 193, 122 A.2d 848; Embden State Bank v. Boyle, 50 N.D. 573, 196 N.W. 820; In re Williamson's Estate, 302 Pa. 462, 153 A. 765; Paul v. Grimm, 165 Pa. 139, 30 A. 721.

We conclude that if our legislature had contemplated only the return of plaintiff's original guaranteed debentures in the circumstances of the instant case it would have used the words "refund the consideration paid" as set forth in the Uniform Securities Act rather than the words "price equal to the full amount paid."

█ Defendants contend that plaintiff cannot recover a money judgment because she did not prove the value of the guaranteed debentures which she surrendered or the certificate of redemption and accrued interest which she received. Defendants argue that the mere fact that the guaranteed debentures had a face value of $12,000 does not mean that they had a true value of $12,000, offering as examples the fact that certain United States Treasury Bonds can be purchased for 67% of their face value and certain major railroad bonds can be purchased for as little as 16% of their face value. Therefore, goes the argument, if plaintiff wanted to rescind she would be entitled to recover only that which she had surrendered. If plaintiff is entitled to sue for damages, the damages must be measured by subtracting the value of what she received from the value of what she surrendered.

Defendants cannot escape liability on the ground that plaintiff failed to introduce evidence as to the value of the original guaranteed debentures or of the redemption certificate and certificate of accrued interest. There is no question but that plaintiff paid $12,000 cash for the original guaranteed debentures. Further, by Smith's own testimony it is clear that General Discount was treating these debentures as equal in cash value to their face value. Because General Discount treated these debentures as substantially equivalent to a certificate of deposit, defendants will not now be heard to say that the debentures were not payable upon demand and that plaintiff would not have been entitled to recover $12,000 from General Discount on the date she surrendered the guaranteed debentures for the certificate of redemption and the certificate of accrued interest.

The fact that the certificate of redemption had no due date is not controlling in view of the fact that Smith unequivocally represented to plaintiff that she would receive payment of at least $1,000 cash within one year with the rest to be paid later.

Where, as here, an unsophisticated investor is importuned by the seller of an unregistered security into exchanging a security which has been treated by the issuer in other cases as being an unequivocal claim for cash equal to its face value for a security having no fixed maturity date, we have no hesitation in holding that the issuer and its agents are bound by the representations which they have made and cannot now be heard to say that the securities did not have the cash value that they said it would have.[8]

---

8. Plaintiff, who was 68 years old at the time of trial, has resided on a farm 11 miles northwest of Freeman, South Dakota, ever since she was a small child. She was engaged in farming with her father and her brother and a sister and continued to reside at the farm home by herself after her father died and her brother and sister left to establish their own homes. Plaintiff's testimony reveals that she relied implicitly upon Smith's representations and promises. "A. He had told us we are to turn our certificates in. He talked about how he was going to pay us and first again the large sums and then the small ones. * * *

Q. Mary, is this all the conversation that took place on November 8th, in Bill Smith's office to the best of your recollection? A. Well, I think we talked more. Q. Do you know what about? A. How he was going to do it. He promised the money. And he promised the interest. The certificates he told us to hand in. And if there is some more money left it will be divided amongst us whoever was supposd to get it. * * *"

We think that the case of Puntenney v. Wildeman & Company, 318 Ill. 139, 149 N.E. 2, is instructive. In that case plaintiff bought $925 worth of shares of Harvey Crude Oil Company in 1919. In 1921 defendants as agents for Harvey Crude Oil Company sold plaintiff 1300 shares of Harvey Crude Oil Company in payment for which plaintiff turned in the shares which she had purchased in 1919. The shares were not registered. Plaintiff sued to recover the $925 paid for the original shares. Defendants contended that because there was no tender back of the original stock, the tender was not sufficient. The Illinois Supreme Court held that the law requiring tender back was sufficiently complied with.

"The Securities Law was passed to protect innocent purchasers from promoters of wild-cat schemes designed to fleece the unwary. If such a promoter could induce his victim to surrender to him the original stock for stock in another blue sky venture, and then take refuge behind the fact that the original stock, which had already been surrendered to him, could not, on suit, be tendered back, the primary purpose of the law would be thwarted. * * * The Securities Law is intended to cover fraudulent stock transactions and the sales of stock of corporations whose principal asset lies in the fluency of speech of the representatives. The situation in this case is one which the Securities Law was intended to cover." 149 N.E. 2, 3.

Although the Puntenney case on its face dealt with the adequacy of the tender back under the Illinois Securities Statute, we think that the effect of the holding is in accord with our decision that as between the seller of an unregistered security and the innocent purchaser thereof the remedies of the security statutes must be liberally construed to carry out the spirit as well as the letter of the law.

We believe that defendant Aman's participation in the transactions involved in the instant case is not shown by the record to be of such a substantial nature as to impose liability

upon him. Plaintiff's own testimony indicates that she did not know that Aman was present at her farm home on November 7, 1965 until Smith had completed the conversation with her in the house. The mere fact that Aman was sitting in Smith's car when plaintiff and Smith came out of the house and had some further conversation near the car is not evidence of participation in the transaction sufficient to impose liability under the terms of the Securities Act. Plaintiff is not entitled to more favorable version of the evidence than she gave herself. Miller v. Stevens, 63 S.D. 10, 256 N.W. 152. There is no question but that Aman was not present at the meeting with Smith in Yankton on November 8, 1965 at which the plaintiff exchanged her guaranteed debentures for the redemption certificate.

In reaching this decision regarding Aman's liability, we are not unmindful of the fact that the provisions of security statutes imposing liability upon those participating or aiding in any way in making such sale have been liberally construed. See, e. g., Adamson v. Lang, 236 Or. 511, 389 P.2d 39. Although we might very well surmise what Smith's purpose was in taking Aman with him to plaintiff's farm home, we cannot on the facts established by this record say that Aman participated or aided in the exchange of plaintiff's guaranteed debentures for the certificate of redemption.

It follows, then, that judgment dismissing the complaint against Aman must be affirmed. The judgment dismissing the complaint against General. Discount and Smith is reversed with instructions to enter judgment in favor of plaintiff against defendants General Discount Corporation and William M. Smith in accordance with this opinion.

HANSON and WINANS, JJ., and BURNS, Circuit Judge, concur.

BURNS, Circuit Judge, sitting for BIEGELMEIER, P. J., disqualified.