**Dale LADD and Gene Gates, Appellants,**

**v.**

**Eddie KNOWLES et al., Appellees.**

**No. 8423.**

Court of Civil Appeals of Texas, Amarillo.

Jan. 28, 1974.

Rehearing Denied Feb. 25, 1974.

Warner & Finney, John W. Warner, Pampa, for appellants.

Gibson, Ochsner, Adkins, Harlan & Hankins, S. Tom Morris, Amarillo, for appellees.

REYNOLDS, Justice.

Plaintiffs Dale Ladd and Gene Gates failed to secure a favorable jury verdict in their suit based on violations of securities laws and on common law fraud to rescind their agreements to purchase stock and to recover from defendants Eddie Knowles, Mike Montgomery and Don Vars, the purchase price paid and claimed damages. The take-nothing judgment entered has been appealed on eleven listed points of error. Affirmed.

The consideration of the points of error necessitates an extended chronology and a particularization of the facts testified to on the trial. The shares of stock involved are those of Agricultural Computing Company, Inc., a private corporation organized by T. M. Brooks and others under the laws of Texas, hereinafter referred to as ACC. Formed in July, 1968, ACC's primary purpose was to computerize the feedlot industry in the Texas Panhandle region. The common stock authorized and issued to the original subscribers at one dollar per share was not registered, as the written subscription agreement made clear, and was restricted as to transfer. [1]

One of the original subscribers and shareholders of record was Norman Motley. Out of his 125,000 subscribed shares, he held 70,000 of them for his sister Nina Jean Stewart, who paid Motley one dollar per share for them, pursuant to their oral agreement that the stock could not be transferred to her until the restrictions were removed. In late July, 1968, Motley, on behalf of Mrs. Stewart, sold 2,000 of her shares to defendant Mike Montgomery, a broker in the Amarillo brokerage office of Dallas Rupe & Son, for $2,000.00 paid by Montgomery with his personal check. The evidence is that Montgomery bought the stock for the account of KMV Associates, an entity composed of defendants Eddie Knowles and Don Vars, residents of Canyon, and Mike Montgomery for the purpose of investing in stocks. On the same day, Knowles and Vars gave Montgomery their respective personal checks for one-third of the purchase price.

Plaintiffs Dale Ladd and Gene Gates, residents of Pampa, acknowledge that at all times during the events leading up to and including the stock transactions involved here, Ladd was the agent for Gates. Plaintiffs became acquainted with ACC through one of its organizers, T. M. Brooks. Ladd and Gates previously had made successful investments in other computer businesses organized by Brooks, and they wanted in on the "ground floor" of ACC before its stock "went public." Upon learning that ACC's original stock issue had been subscribed, Ladd, on behalf of himself and Gates, began the attempt to buy some of the stock before any public offering was made.

Ladd was a customer of Dallas Rupe & Son. He contacted Robert C. Hill, branch manager of the Amarillo office, and asked if Hill knew of anyone who was willing to sell some ACC stock. It is not precisely clear how or in what manner or by which words of communication that Ladd was informed, but it is accepted that Montgomery was the source of the information, that Knowles might sell some ACC stock. Ladd was told the price of the stock would be four dollars a share, and he requested a broker in the office to have Knowles send him a letter.

Following a conference between the members of KMV Associates, at which it was determined that the 2,000 shares of stock would be sold for four dollars per

---

1. Each stock certificate issued bore this legend: "The shares evidenced by this certificate may not be sold, assigned, transferred or hypothecated except (1) pursuant to an offering of same duly registered under the Securities Act of 1933, as amended, or (2) pursuant to a no action letter of the Securities and Exchange Commission, or (3) under circumstances which in the opinion of counsel satisfactory to Agricultural Computing Company do not at the time require registration of such shares under the Securities Act of 1933, as amended. . . . ."

share, Knowles mailed Ladd a blank form agreement, prepared or caused to be prepared by Montgomery, for approval and signature. Ladd was not satisfied with the form of the agreement. With the assistance of a Pampa insurance man, two letter agreements were prepared, one ·for Ladd and one for Gates, which were transmitted to Knowles with Ladd's letter reading in part:

"From being involved in the past on this same type of transaction I believe that the letter of agreement would be signed by you rather than by me.

"Since I was purchasing this in partnership with Mr. Gates I am enclosing two separate agreements for your approval and signature . . . .

"Our checks in the total amount of $8,000.00 will be mailed to you on the same date that I receive this completed agreement back."

Knowles signed the agreements[2] on September 20, 1968, mailed them, and received the personal checks of Ladd and Gates made payable to his order in the sum of $4,000.00 each. The checks were endorsed and deposited to the account of KMV Associates, and each of the defendants received one-third of the sale price.

Both plaintiffs knew at the time of the transactions that the stock was not registered, that it was restricted from transfer, and that it could not be transferred to them until the restrictions were removed. They also knew that the venture was speculative, that ACC might never succeed with a public registration and that the restriction on transferability might never be

removed. Furthermore, they knew that Knowles did not have a stock certificate and that the stock had not been transferred into his name.

Thereafter, both plaintiffs, acting through Ladd, purchased other similar ACC stock on letter agreements from J. R. Barnhill, who was not an original subscriber and who had no certificate of stock. Ladd also purchased stock in two other companies that merged with ACC, and he finally acquired over 30,000 shares of ACC stock. ACC was not a successful venture; it did not succeed with a public registration of its stock; the restriction on transferability was never removed; and the stock ceased to have any market value. At the time of trial, ACC's liabilities exceeded its assets.

In August of 1971, Ladd caused his accountant to write a letter to Knowles, requesting the number of the stock certificate or a refund of the purchase money with interest. Gates testified he personally never made any demand for delivery of a certificate to him, since he knew that the stock had not become transferable.

Shortly thereafter, Ladd telephoned the office of Schneider Bernet & Hickman to inquire about some stock quotes. The telephone was answered by Montgomery, who had joined the firm on June 1, 1970, when Dallas Rupe & Son closed its Amarillo office. Ladd's recollection of the conversation was that when Montgomery discovered Ladd was calling, Montgomery told him ". . . to get off of Eddie Knowles' back, that I had no right to writing him any kind of letter, that he was strictly legal in doing what he did." Ac-

---

2. The two agreements were identical except for the names and addresses of the two plaintiffs. The body of the letter agreement executed by Knowles for Ladd reads:

"This will confirm sale to you of 1,000 shares of Agricultural Computing Company Inc. common stock for $4.00 per share and acknowledge that a total of $4,000.00 will be paid to me by C. Dale Ladd upon receipt of this signed agreement.

"I, Eddie Knowles, agree that at such time as the restriction is removed from Agricultural Computing Company Inc. stock certificate #_____, I will assign 1,000

shares over to C. Dale Ladd immediately after transfer of stock is permitted by the Company and the Transfer Agent.

"I further agree that if a stock option purchase is offered by the directors of Agricultural Computing Company Inc. on this stock certificate or if a dividend is paid on this certificate the same will be offered or paid on a pro-rata percentage basis to C. Dale Ladd. I further agree that if a stock split shall take place before this restriction is removed that an assignment will be made on the basis of such split."

cording to Ladd, Montgomery did not give him a stock certificate number and did not state that he had an interest in the stock plaintiffs had purchased. Montgomery's rememberance of the occurrence was that after Knowles received the letter from Ladd's accountant, Montgomery contacted Mrs. Stewart for the certificate number. He then telephoned Ladd ". . . and told him that Eddie had to be out of town, that I was advising him of which certificate the stock that we owed him would come from." Montgomery did not recall telling Ladd "to get off of Knowles' back" and, although Ladd ". . . made a reference of some sort to legal action, or a lawsuit or something . . .," he did not recall trying to persuade Ladd.

Meanwhile, there was a reverse one-for-two stock split of ACC stock. Mrs. Nina Jean Stewart ultimately became a record stockholder of ACC and on June 30, 1972, she assigned a certificate for 500 shares of ACC stock to Dale Ladd. The certificate was tendered by Knowles' attorney to Ladd as the number of shares to which he was entitled after the reverse stock split. Ladd had his attorney reject the tender, stating that he had elected to rescind the transaction.

On September 19, 1972, one day less than four years after the date of the agreements, plaintiffs Dale Ladd and Gene Gates filed separate suits against defendant Eddie Knowles. Each suit sought a recission of the agreement applicable to the plaintiff and a recovery of the purchase money paid, together with specified damages, on allegations of Knowles' false representation of his authority to sell the stock and illegality of contract. Alterna-

tively, it was alleged that the contract was not performed within a reasonable time and there was an impossibility of Knowles' performance.

Knowles' deposition was taken on the following October 9th. On that occasion, Knowles declared that Mike Montgomery and Don Vars each owned a one-third interest in the ACC stock Knowles sold to Ladd and Gates.

On December 11, 1972, each plaintiff filed in his pending suit his first amended original petition and included Montgomery and Vars, together with the original defendant Knowles, as defendants. Seeking recission of the letter agreement and recovery of the purchase price paid and specific damages, each plaintiff grounded entitlement thereto on fraud and illegality of contract.

The live pleadings on which plaintiffs went to trial were cast in plaintiffs' consolidated third amended petition. Admitting that they knew the stock was not registered and was restricted as to transferability, plaintiffs predicated their entitlement to the pleaded recission of the transactions and recovery of the purchase price paid for the stock, interest thereon and punitive damages on defendants' violations of specific provisions of the federal securities laws, a rule of the Securities and Exchange Commission, and of specific sections of The Securities Act of Texas, Vernon's Ann.Civ.Stat. art. 581, and on common law fraud.

As to specificity, plaintiffs charged defendants, in selling them securities which were not registered as provided in Art. 581–7, with violations of Art. 581–29, subd. B[3] and Art. 581–33, subd. A(1) and (2).[4]

3. "Any person who shall:
 *      *      *      *      *
"B. Sell, offer for sale or delivery, solicit subscriptions to and orders for, dispose of, invite orders for, or who shall deal in any other manner in any security or securities issued after September 6, 1955, unless said security or securities have been registered or granted a permit as provided in Section 7 of this Act, shall be deemed guilty of a felony, and upon conviction thereof shall be sentenced to pay a fine of not more than

Five Thousand Dollars ($5,000) or imprisonment in the penitentiary for not more than ten (10) years, or by both such fine and imprisonment."

4. "Any person who
 (1) Offers or sells a security in violation of Sections 7, 9 (or any requirement of the Commissioner thereunder), 12, 23B or any order under 23A of this Act, or
 (2) Offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means

The common law fraud action, not precluded by Art. 581–33, subd. F,[5] was based on allegations that Knowles willfully and wrongfully concealed that he was involved with two other owners of the stock, one of whom was a stockbroker, that Knowles and Montgomery willfully and wrongfully concealed from Ladd that Montgomery was a co-owner of the stock, and that, knowing it was illegal for a stockbroker to sell unregistered stock, plaintiffs would not have purchased the stock if they had known it was being sold to them in whole or in part by a stockbroker.

Plaintiffs further alleged that they did not know of Montgomery's involvement until October, 1972, and that defendants were estopped to claim the defense of the statutes of limitation. They pleaded that none of the exemptions provided by Art. 581 applied to defendants.

Defendants joined plaintiffs' trial issues with their second amended original answer pleadings. Additional to a general denial, the answer set out the affirmative defenses of an exempt transaction under the federal securities laws, an exempt transaction under Art. 581–5,[6] the prohibition on recovery under Art. 581–33, subd. D,[7] the three-year statute of limitation provided by Art. 581–33, subd. C,[8] and the two- and four-year statutes of limitation specified by Arts. 5526, 5527 and 5529, V.A.T.S.

At the conclusion of the evidence adducing factual testimony bearing on the allegations of fact made in the pleadings, all parties moved for an instructed verdict. Denying the motions and overruling objections to the court's charge, the trial court submitted the consolidated causes to the jury on four special issues. Corresponding

---

of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made not misleading (when the person buying the security does not know of the untruth or omission, and who in the exercise of reasonable care could not have known of the untruth or omission) is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent (6%) per year, . . . Nothing herein shall prevent the award of punitive or exemplary damages in an amount not to exceed twice the actual damages, as found by the jury, when such false representation or omission is proven to be willfully made."

5. "F. The rights and remedies provided by this Act are in addition to any other rights or remedies that may exist at law or in equity."

6. "Except as hereinafter in this Act specifically provided, the provisions of this Act shall not apply to the sale of any security when made in any of the following transactions and under any of the following conditions, . . . :
\* \* \* \* \*
"C. (1) Sales of securities made by or in behalf of a vendor, whether by dealer or other agent, in the ordinary course of bona fide personal investment of the personal holdings of such vendor, or change in such investment, if such vendor is not engaged in the business of selling securities and the

sale or sales are isolated transactions not made in the course of repeated and successive transactions of a like character; provided, that in no event shall such sales or offerings be exempt from the provisions of this Act when made or intended by the vendor or his agent, for the benefit, either directly or indirectly, of any company or corporation except the individual vendor (other than a usual commission to said agent), and provided further, that any person acting as agent for said vendor shall be registered pursuant to this Act;
\* \* \*"

7. "D. No person who has made or engaged in the performance of any contract in violation of any provision of this Act or any rule or order or requirement hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract."

8. "C. No person may sue under Subsection A(1) of this Section 33 more than three (3) years after the contract of sale. . . . No person may sue under Subsection A(2) more than three (3) years after the contract of sale or more than three (3) years after the buyer in the exercise of ordinary care should have discovered that such sale was made in violation of said Subsection A(2). Nothing in this Subsection C shall affect or restrict the periods of limitation or other rights applicable to causes of action based on fraud brought pursuant to Article 4004 of the Revised Civil Statutes.

to the numbered issues, the jury found that (1) the failure of Knowles, and (2) the failure of Montgomery, to disclose to Ladd that Montgomery owned an interest in the stock being sold was not a material fact; and (3) Ladd and Gates by using ordinary care could have known on September 20, 1968, that Montgomery owned an interest in the stock sold. The fourth issue relative to punitive damages was not required to be, and it was not, answered under its conditional submission.

Parenthetically, it is noted that the court, in submitting the charge obviously found as a matter of law that defendants failed to discharge their burden to prove the facts requisite to justify the submission of their pleaded exemptions from operation of the securities laws, and that a factual inquiry into violations of federal securities laws and regulations was not warranted. None of these matters are raised in this appeal by the parties pleading reliance thereon and, to that extent, these matters will not be further noticed. Moreover, it is equally obvious from the charge that the court found as a matter of law that defendants were liable to plaintiffs unless the omission to reveal Montgomery's participation was not a material fact or plaintiffs, in the exercise of ordinary care, could have known on September 20, 1968, of Montgomery's ownership interest in the stock.

Following the entry of the take-nothing judgment, plaintiffs filed a motion for new trial. Before the motion was acted on, plaintiffs filed a motion for judgment non obstante veredicto and at the same moment filed their amended motion for new trial. This record shows that neither motion was acted on by the trial court, plaintiffs timing their appeal from the date the amended motion for new trial was overruled by operation of law.

■ Twelve of the twenty-three grounds of error alleged in the amended motion for new trial are referenced to the court's overruling the motion for judgment non obstante veredicto. Appellate point of error number IV is solely, and portions of points numbered I, V, VI, VII, VIII, IX and X are partially, predicated on the assertion that the trial court erred in overruling a particular portion of the motion for judgment non obstante veredicto. What plaintiffs overlook, however, is that a motion for judgment non obstante veredicto not acted on by the trial court preserves nothing for review, Murphy v. Maroney, 456 S.W.2d 787 (Tex.Civ.App.—Waco 1970, writ ref'd n. r. e.), and furnishes no basis for a point of error. Permian Corp. v. Trumbull Asphalt Co. of Delaware, 472 S.W.2d 555 (Tex.Civ.App. —Corpus Christi 1971, no writ); Carr v. Gregory, 472 S.W.2d 819 (Tex.Civ.App.—Corpus Christi 1971, no writ). Thus, point number IV will not be considered, except for the notation that the review of the record reveals no reversible error in connection with this point; and the motion for judgment non obstante veredicto will not be referred to in consideration of the other points mentioning the instrument.

■ Initially, plaintiffs assign error to the overruling of their motion for instructed verdict on all issues except that of punitive damages. The thrust of the argument is that since it is undisputed that the stock was not registered, the letter agreement transactions—unless, but not shown to be, exempt—were illegal because they violated Art. 581–29, subd. B (set forth in marginal note 3), and the instructed verdict motion on this ground should have been granted. The point is not well taken. Both by their pleadings and by their testimony, plaintiffs judicially admitted they knew the stock was not registered when they purchased it. Thus, if the transactions were in fact illegal solely because the stock was not registered, plaintiffs, by knowingly joining with defendants in the illegal scheme, were equally culpable with defendants and, therefore, in pari delicto. As such, plaintiffs were precluded from an instructed verdict on the ground alleged by the provisions of Art. 581–33, subd. D marginally

reproduced in note 7. The first point is overruled.

■ Secondly, the failure of the court to submit defendants' pleaded affirmative defense of exemption is advanced as error. The point must fail for two reasons. First, the error, if any, was not preserved. Although defendants did object to the court's failure to submit their requested defensive issues of exemption, plaintiffs did not object to the charge for this reason. The objection they made that is relied upon for this point of error is an objection to the failure of the court to affirmatively charge that defendants violated Art. 581–29, subd. B. Rather than objecting because the affirmative defense was not given, the objection plaintiffs made only asserted that the defensive exemption pleaded was not supported by the evidence. Therefore, the complaint now made by plaintiffs was waived in the trial court. Rule 274, Texas Rules of Civil Procedure; Texas Employers' Insurance Ass'n v. Neuman, 379 S.W. 2d 295 (Tex.1964). Furthermore, although the defendants did object to the court's charge because of the omission, they, being satisfied with the judgment, did not bring forward on appeal any complaint of the failure of the trial court to submit their requested issues. Consequently, there is no basis in these circumstances for plaintiffs to complain on appeal of the failure of the court to submit the defendants' issues. Texas Employers' Insurance Ass'n v. Neuman, supra. The second point is overruled.

Thirdly, plaintiffs assert error in the failure of the court to submit their defense of estoppel to defendants' defense of limitations. The proposition proclaimed is that when Ladd had his conversation with Montgomery in August or September of 1971, less than three years after the stock transactions, Montgomery's continued concealment of his interest in the stock "perhaps" caused plaintiffs to forego bringing their suit within the three-year period permitted by Art. 581–33, subd. C. The proposition, and the point of error it purports

to uphold, falls for lack of the proper foundation.

On the one hand, plaintiffs did not, as affirmatively required by Rule 279, T.R.C. P., submit requested special issues in substantially correct wording of estoppel based on Montgomery's concealment of his interest in the stock. Instead, plaintiffs commingled, in transgression of Rule 273, T. R.C.P., their objection to the failure of the court's charge to include the issue of estoppel with requested issues of estoppel based, not on Montgomery's concealment, but on his conversational representation that plaintiffs had no cause of action against Knowles. In consequence thereof, plaintiffs waived the issue of estoppel now asserted. Rules 273, 279, T.R.C.P. See Metal Structures Corp. v. Plains Textiles, Inc., 470 S.W.2d 93 (Tex.Civ.App.—Amarillo 1971, writ ref'd n. r. e.).

■■ On the other hand, the issue of estoppel now advanced was not raised by the evidence. To constitute estoppel of reliance on a statute of limitation, the estopped party must have done or said something that amounted to an affirmative inducement to delay bringing the action. Squyres v. Christian, 253 S.W.2d 470 (Tex.Civ.App.—Fort Worth 1952, writ ref'd n. r. e.). Neither Ladd nor Gates testified that any act or omission on the part of, or any statement made by, Montgomery was a representation that they had no cause of action against Knowles that caused them to delay filing suit. It is fundamental that only issues raised by the evidence are submissible and, there being no evidence on the issue of estoppel, the trial court correctly refused submission of the issue for this reason. The third point is overruled.

At this juncture, a recapitulatory posture of the litigation is worthy of consideration. The establishment of plaintiffs' causes of action asserted to be viable on appeal was unimpeded by the rejected defense of exempt transactions. However, plaintiffs foreclosed their statutory action for the

sale of unregistered stock as shown in the disposition of their first point of error, leaving the statutory and common law fraud causes of action grounded on concealment, subject only to the interposed defense of limitations. The aspect of alleged concealment of the fact that defendants were not record stockholders failed at the judicial admission by plaintiffs of knowledge of the fact at the time they purchased the stock. The facet of concealment by Knowles that there were other vendors partially failed when plaintiffs judicially acknowledged that it would have made no difference if they had known Vars owned part of the stock.

For recovery, then, plaintiffs were relegated to the establishment of the fact that the concealment of, by omission to reveal, Montgomery's ownership interest in the stock was a material fact that induced them to enter into the agreements to purchase the stock, and to the negation of any evidence that they could have known, in the exercise of ordinary care, of this fact on September 20, 1968, when they purchased the stock. The jury found both facts adverse to plaintiffs' position thereon.

If, in fact, Montgomery's ownership interest in the stock was not a material inducement, then plaintiffs' knowledge or lack thereof at the date of purchase is of no essential consequence. Conversely, if plaintiffs were in fact chargeable with knowledge of Montgomery's ownership interest in the stock at the time of their purchase, it matters not whether his ownership interest was a material or an immaterial fact.

In this setting, plaintiffs challenge both the legal and the factual sufficiency of the evidence to support the jury findings. Points of error five, six and seven are addressed to the special issues nos. 1 and 2 findings of immateriality of Montgomery's interest. Points eight, nine and ten are directed to the special issue no. 3 finding that plaintiffs by using ordinary care could

have known on September 20, 1968, that Montgomery owned an interest in the stock sold. The latter group of points are first considered.

Plaintiffs state that since the brokerage firm, in which they were entitled to place trust and confidence, referred them to Knowles, and defendants omitted to reveal Montgomery's ownership interest, they would have no reason to question whether Knowles was the sole owner and, therefore, the record is absolutely void of any evidence that they knew Montgomery owned an interest in the stock. Therefrom, plaintiffs conclude that even the pyramiding of inferences and presumptions will not produce evidence to support the special issue no. 3 finding that plaintiffs were chargeable with knowledge.

■ Admittedly, there is no evidence that plaintiffs knew of Montgomery's interest when they bought the stock; but what plaintiffs ignore and do not discuss in their presentation is that the jury found that plaintiffs by using ordinary care could have known of Montgomery's interest. In an arm's length transaction, the party alleging fraud must exercise ordinary care for the protection of his own interests, and he is charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated. And a failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party. Courseview, Incorporated v. Phillips Petroleum Co., 158 Tex. 397, 312 S.W.2d 197 (1957).

Here, plaintiffs secured their information about the ACC stock from T. M. Brooks, and they desired to purchase the stock. When they found they could not get in on the "ground floor," they set about to secure the stock before it "went public." Upon being referred to Knowles, they made no inquiry whatever about him and particularly made no inquiry as to the source of the stock, although they knew the stock was not in Knowles' name. Pre-

vious thereto, defendants had not sought to sell the stock; rather, the evidence is that they were holding the stock as an investment. Plaintiffs knew the stock was unregistered and speculative—indeed, these were the very features that generated their interest in purchasing the stock before it was registered and became eligible for public offering. They further knew that the stock was restricted as to transfer, that the restrictions might never be removed, and that it could not be transferred to them until the prohibition on transfer was removed. Plaintiffs relied completely upon their own investigation of the stock, and no representations were made to them concerning anything to which their investigation did not extend. There is no suggestion that defendants did anything to prevent plaintiffs from discovering Montgomery's interest; plaintiffs simply made no inquiry. Neither is there any suggestion that plaintiffs would not have received the ownership information if they had asked for it; when they did ask Knowles more than four years later, he declared the ownership interest.

■ As the jury was properly charged, the standard of care required of plaintiffs was the care a person of ordinary prudence would use under the same or similar circumstances. From the facts and circumstances shown, the jury, as the judge of the credibility of the witnesses and the weight to be given their testimony, was entitled to find that the transactions were at arm's length, that plaintiffs initiated the efforts to induce defendants to sell the stock, and that plaintiffs were neither imposed upon by, nor induced to purchase the stock through, any acts or statements of the defendants. Moreover, the defendants asserting the transactions were exempt under, and therefore not violative of, the securities laws and not having initiated the transactions, the jury could have concluded that defendants did not willfully omit to disclose Montgomery's interest. From these premises, the jury was privileged, as it did, to draw the reasonable inference that plaintiffs could have known of Montgomery's interest on the date of the transactions by asking, as an ordinarily prudent person would have asked knowing that the person from whom he was purchasing stock did not own the stock in his name, the same question that was asked more than four years later.

It follows that there is some evidence of probative force to support the finding to special issue no. 3, and the finding is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. Points five, six and seven are overruled.

The sustained special issue no. 3 finding establishes the defense of limitation, and is dispositive of the materiality of Montgomery's participation. Nevertheless, points eight, nine and ten contesting the evidence to support the findings of immateriality are briefly discussed.

Defendants did not, and there is no imputation that they did, misrepresent Montgomery's ownership interest by any statement made; instead, plaintiffs rely upon the omission to state Montgomery's interest which, impliedly, was a necessary revelation in order not to mislead plaintiffs. Both Ladd and Gates testified that they would not have purchased the stock had they known a broker was involved. This was the only direct testimony bearing on the fact to be established. The jury, as was its prerogative and as is apparent from its findings, declined to believe this was the fact; however, the rejection of the testimony did not establish the contrary. If the opposite of the direct testimony is to be found, and sustained, it must be warranted from all the facts proved, the circumstances shown and the reasonable inferences drawn therefrom.

■ It is clear that both before and after the transactions challenged here, plaintiffs had purchased unregistered, restricted stock in a similar manner. Plaintiffs, first learning about the ACC stock from T. M. Brooks, were aware that Brooks was con-

nected with ACC, and they had made similar successful investments in stocks in new computer companies with which Brooks was connected in the organization thereof. Plaintiffs knew the speculative status of the ACC stock and the ramifications connected with it. It is undisputed that, knowing all these facts, plaintiffs still wanted in on the "ground floor" of ACC and when they found the initial subscription of stock was sold, they became the actors in seeking out and soliciting the sale of the stock. When they were negotiating for the stock, they knew Knowles did not have a certificate and that the stock was not in his name, yet they made no inquiry as to the ownership source from which their purchased stock would come. They subsequently bought the same kind of unregistered stock from J. R. Barnhill in a similar transaction without any concern, so they admitted, as to the source of the stock he was selling. It was only after the stock became worthless that plaintiffs instituted their suits. From these facts the jury was justified in drawing the reasonable inference that, opposed to plaintiffs' statements, it was not material to them that Montgomery, a broker, owned an interest in the stock they purchased. Points eight, nine and ten are overruled.

In their eleventh and last point, plaintiffs allege, in a multifarious manner, an abuse of discretion by the trial court's limiting the time to study and respond to the court's charge. However, the force of the argument is confined to the proposition that plaintiffs' counsel was allowed only fifteen minutes to examine the charge before being required to present his objections, the time for which was not limited, and this resulted in harm to plaintiffs. The point is considered from this view.

Rule 272, T.R.C.P., provides that attorneys shall be given a reasonable time to examine and present objections to the charge of the court, and that failure to give a reasonable time for examination shall be reviewable on appeal upon proper exception. Assuming that, without pausing

to decide whether, fifteen minutes was not a reasonable time under all the related circumstances detailed in the record for examination of the charge, the assignments of resultant harm are examined for reversible error.

First, plaintiffs contend that a reasonable time for inspection would have prevented the court's oversight in failing to submit, in connection with special issues nos. 1 and 2 inquiring of the materiality of the failure to disclose Montgomery's interest in the stock to Ladd, the same issues as to Gates. That there was no oversight on the court's part is manifest by plaintiffs' recitation that these issues were requested and refused. The refusal was not assigned as error and the matter is waived. Furthermore, plaintiffs judicially admitted that Ladd was the agent of Gates, which binds Gates and renders superfluous the same issues as to Gates.

The second contention is that special issue no. 3 was multifarious because it inquired whether plaintiffs ". . . did not know and could not by the exercise of ordinary care have known . . ." of Montgomery's interest in the stock sold. Admittedly, the issue embraces two elements but that alone does not render the issue fatally defective. That plaintiffs did not know of Montgomery's interest was undisputed, and that element should not have been included in the special issue. The inclusion of that element, while rendering the issue multifarious, was harmless since the element was established without dispute in the record. Wooten v. Crosby County, 219 S.W.2d 553, 557 (Tex.Civ.App. —Amarillo 1949, writ ref'd).

The third and final harmful result alleged is that the court failed to charge that one or more of the defendants committed a felony in selling the unregistered stock to plaintiffs. This complaint was one of plaintiffs' overruled objections to the charge, and the overruling thereof was not preserved for appeal. Additionally, were the point properly preserved and asserted

on appeal, it would not present error. Under the circumstances, the giving of the requested instruction not only would have been a prohibited comment on the weight of the evidence. but it would have been an immaterial and prejudicial instruction. The giving of an instruction of that character would have constituted error. Dial Temp Air Conditioning Company v. Faulhaber, 340 S.W.2d 82, 89 (Tex.Civ.App.—Dallas 1960, writ ref'd n. r. e.).

Therefore, even if the limited time allowed for examination of the charge were too restrictive, the failure of plaintiffs to demonstrate that harm resulted therefrom renders the error harmless. Rule 434, T.R.C.P. The last point is overruled.

The judgment is affirmed.